**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, *et al.*,[1] | ) | Case No. 23-90116 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| DIAMOND SPORTS GROUP, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 23-03135 |
| | ) | |
| JP MORGAN CHASE FUNDING INC. and JP MORGAN CHASE & CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>COMPLAINT</u>**

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases ra.kroll.com/DSG. The Debtors' service address for purposes of these chapter 11 cases is: c/o Diamond Sports Group, LLC, 3003 Exposition Blvd., Santa Monica, CA 90404.

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 6

PARTIES ......................................................................................................................... 7

FACTUAL BACKGROUND .......................................................................................... 7

I.      Diamond's Business Operations ....................................................................... 7

II.     SBG's Acquisition of the Diamond RSNs from Disney .................................. 9

III.    SBG's Post-Acquisition Control of Diamond................................................. 11

IV.     Diamond's Business Prospects Continue to Deteriorate ................................ 16

A.      The Irretrievable Loss of DISH Network ....................................................... 17

B.      Diamond Loses Additional Major Distribution Channels .............................. 21

C.      Impact of COVID-19 ....................................................................................... 22

V.      DSG Was Insolvent By At Least December 2019 (And Possibly Earlier)...... 23

VI.     The Transfers .................................................................................................. 30

A.      Terms of the Preferred Equity Units ............................................................... 31

B.      The SBG Guaranty........................................................................................... 32

C.      Mechanics of Distributions and Purported Solvency Certifications................ 32

D.      Empire's Solvency Opinion ............................................................................. 35

E.      DSG, Acting Under the Complete Control and Domination of Sinclair, Acted
        With Fraudulent Intent in Making the Initial DSIH Transfers to DSIH .......... 42

VII.    JPMC Aided And Abetted Breaches Of Fiduciary Duty Owed To DSG By Smith,
        Ripley, Rutishauser and SBG ......................................................................... 44

VIII.   DSG's Inevitable Bankruptcy ........................................................................ 46

IX.     SBG Purchases JPMCFI's Remaining Preferred Units ................................. 47

CAUSES OF ACTION .................................................................................................. 47

COUNT I ....................................................................................................................... 47

COUNT II ...................................................................................................................... 49

COUNT V ...................................................................................................................... 53

PRAYER FOR RELIEF ................................................................................................ 56

i

Plaintiff Diamond Sports Group, LLC ("DSG" or "Plaintiff," and collectively with its Debtor-affiliates, "Diamond"), for its Complaint against Defendants JP Morgan Chase Funding Inc. ("JPMCFI") and JP Morgan Chase & Co. ("JPMC," and together with JPMCFI and JPMC's other affiliates, "JPM"), alleges as follows:

## INTRODUCTION[2]

1.      In August 2019, Sinclair Broadcast Group, Inc. ("SBG," and, together with its affiliates other than the Debtors, "Sinclair") acquired Diamond from The Walt Disney Company ("Disney") in a $10.6 billion leveraged acquisition (the "Acquisition").  In order to fund the $10.6 billion purchase price, SBG caused DSG to incur $8.2 billion in debt.  JPM, which had served as SBG's lead investment banker since the early 1990s, committed to funding 60% of that debt in exchange for lucrative fees, and then sold the debt to third party investors to offload the risk that DSG would not be able to repay it.  The purchase price was also funded by the proceeds of $1.025 billion face amount of preferred equity units (the "Preferred Equity Units") issued by SBG's indirect subsidiary Diamond Sports Holdings LLC ("DSH"), the only asset of which was an indirect equity interest in DSG.  JPMCFI purchased all of the Preferred Equity Units (in exchange for another lucrative fee), but insisted that SBG issue a Guaranty of Collection (the "SBG Guarantee") for when "we ask Diamond and Diamond comes up short with the $$."  JPM earned more than $245 million in fees in connection with its role as underwriter and its purchase of the Preferred Equity Units, not including the interest JPMCFI was paid in connection with the Preferred Equity Units or any advisory fees paid to JPM by SBG.

---

[2] Although DSG conducted limited Rule 2004 discovery of JPMCFI in advance of the commencement of this adversary proceeding, such discovery was narrow in scope, and makes clear that there is significant additional relevant information that JPM has not yet produced.  For the avoidance of doubt, DSG expressly reserves its right to seek discovery from JPMCFI, JPM, and third parties pursuant to the Federal Rules of Civil Procedure, as incorporated herein through the Federal Rules of Bankruptcy Procedure.

2.      As JPM was well aware, at the time of the Acquisition, DSG's business was facing significant challenges.  DSG owns and operates regional sports networks ("RSNs").  The RSNs acquire broadcast and other rights from sports teams and leagues, generally through multiyear agreements requiring large, fixed payments by the RSNs, and enter into distribution agreements with cable, satellite, or virtual distributors to include the RSNs in packages the distributors sell to their subscribers.  Before the Acquisition, the RSN business model faced a secular decline from increasingly large numbers of potential viewers "cutting the cord" on their subscriptions, and instead viewing sports broadcasts via streaming services, in short highlight segments, or not at all.  Cord-cutting by customers reduces the distributors' willingness to continue paying carriage fees to the RSNs at historic levels (or at all), while the RSNs continue to incur large, fixed fees payable under their rights agreements with teams and leagues.

3.      Moreover, on July 29, 2019, less than a month before the Acquisition closed, a major satellite distributor that carried the RSNs, DISH Network LLC ("DISH Network"), cut its ties with DSG.  DISH Network had previously represented over $350 to $400 million in annual revenue for the RSNs, or approximately 10% of their total revenue, and 20% of their EBITDA.  DISH Network's Chairman, Charlie Ergen, stated publicly that "it doesn't look good that the regional sports will ever be on DISH again."  Both Sinclair and JPM were aware of the material impact that the loss of DISH Network's business would have on DSG's business.

4.      Continued further public statements by DISH Network reaffirmed that DSG was virtually certain not to be able to recover DISH Network as a customer (at least not without agreeing to drastic rate cuts).  As early as December 2019, analysts reported that "the market prices in as little as 10% chance that DISH [Network] comes to terms on the RSNs."  And other

significant distribution customers, including YouTube TV ("YouTube") and Hulu with Live TV ("Hulu"), followed DISH Network in abandoning the RSNs in 2020.

5.     By December 2019, and possibly earlier, DSG was insolvent.  In internal emails dated December 5, 2019, Joseph Ferraiolo, JPM's Head of Debt Capital Markets Operations & Merchant Bank Policy, panicked that DSH would not be able to pay its obligations on the Preferred Equity Units because DSG had "missed [its] numbers."  Richard Gabriel, a JPM Managing Director that worked on the Acquisition, responded that JPM should "focus on [DSG's] public debt," which did not have an SBG guarantee.  Gabriel added in all capitalized letters:

> THAT IS WHY WE STRUCTURED [the Preferred Equity Units] THIS WAY AND DIDN'T GIVE IN TO NOT HVING A GUARANTEE FROM SINCLAIR THE PARENT COMPANY.  YOUR WELCOME.

6.     Shortly thereafter, on March 4, 2020, a JPM analyst issued a report stating that SBG equity investors were "attributing little or no value to the [Diamond] RSNs," and that based on her assumptions regarding DSG's EBITDA and multiple, DSG had "negative equity value."  She added that it was "unclear when the [DSG] silo can dividend cash back to the holding company," which, apart from SBG, was the only source of funding for payments on the Preferred Equity Units.

7.     By mid-March 2020, trading prices for DSG's debt reflected the market's view that DSG would be unable to repay its debts, with the trading price of DSG's secured debt falling to seventy cents on the dollar, and its unsecured debt trading below sixty cents on the dollar.  By September 2020, according to Sinclair's own financial reporting, DSG had to write off $4.2 billion in goodwill, leaving it with billions of dollars in negative equity.

8.     Nevertheless, between September 30, 2019 and the end of 2022, as DSG's financial condition rapidly deteriorated, SBG—aided and abetted by its purported advisor JPMC— systematically caused DSG to dividend more than $929 million (the "Initial DSIH Transfers") to

its direct parent, Diamond Sports Intermediate Holdings LLC ("DSIH").  The money was then transferred up the corporate chain to Diamond Sports Intermediate Holdings A, LLC ("DSIH-A") and DSH, and then out to JPMCFI (the latter transfers, the "Subsequent JPMCFI Transfers")[3] in order to satisfy DSH's obligations on the Preferred Equity Units and ensure that SBG would not be called upon to satisfy the SBG Guarantee.[4]  The Transfers occurred while DSG's business was spiraling towards bankruptcy and, with respect to all of the Transfers save one, after DSG was unquestionably insolvent.

9.      Indeed, on December 13, 2019, only two weeks after JPM lamented that DSG had "missed [its] numbers" and worried that DSH would not be able to pay its obligations on the Preferred Equity Units, SBG caused DSG to transfer more than $305 million to DSIH, to be subsequently funneled up the corporate chain and out to JPMCFI for SBG's benefit.  More than $370 million more was transferred to DSIH and out to JPMCFI between June 30, 2020 and December 31, 2022, *after* a JPM analyst concluded that DSG had "negative equity value."  Further, on August 12, 2020, six days before SBG caused DSG to make another transfer totaling more than $350 million to DSH for ultimate payment to JPMCFI, Jim Casey, JPM's Co-Head of Global Investment Banking, agreed to waive a 2% call premium owed by DSH, reasoning that "our desire to get repaid in a credit that is really struggling from Covid outweighs the benefit of hanging on for a small premium."

10.      DSG, which had no obligations on the Preferred Equity Units whatsoever, received no consideration or benefit in exchange for making the Initial DSIH Transfers or as a result of the

---

[3]  The JPMCFI Subsequent Transfers, together with the subsequent transfers to DSIH-A and DSH, are referred to herein as the "Subsequent Transfers."  The Subsequent Transfers and Initial DSIH Transfers, collectively, are referred to herein as the "Transfers."

[4]  DSG is currently challenging the Initial DSIH Distributions and the subsequent transfers to DSIH-A and DSH in a separate action.  For procedural convenience of the parties and the Court, DSG intends to seek identical scheduling orders and cross-use of discovery with respect to both actions.

Subsequent Transfers.  Instead, the purpose of the Transfers was to ensure that the SBG Guarantee would not be triggered notwithstanding DSG's insolvency.  By using cash from DSG to satisfy the Preferred Equity Unit obligations, SBG directly benefitted itself and its subsidiary, DSH, at the direct expense of DSG and its creditors.  This was, to quote a Moody's Credit Opinion, "detrimental to [DSG's] debtholders."  Indeed, on August 4, 2020, a JPM Executive Director observed that one of the reasons that DSG's bonds were trading between 54 and 59 cents on the dollar was because "Bondholders think Sinclair will continue to prioritize paying down the preferred [Equity Units] rather than look to buyback bonds" at a discount in order to reduce DSG's debt load.

11.      Adding insult to injury, at the same time, JPMC, in its purported role as advisor to Sinclair, was advising Sinclair that this was exactly what it should be causing DSG to do.  For example, in December 2019, JPMC provided Sinclair with confidential "Discussion Materials" regarding potential strategic options for Sinclair's consideration.  JPMC advised Sinclair that DSG's "depressed trading levels" "may create a window for DSG to buyback and retire a portion of the debt at a discount to par through Open Market Purchases."  JPMC concluded, however, that "Paying down preferred equity is more [net present value] positive than buying back notes," in part because "Paying down preferred equity will reduce the amount of obligations that are subject to a guarantee from SBG."  A separate JPMC presentation from the same period underscored this point further, advising Sinclair that "[u]pon bankruptcy or insolvency, JPM can look to SBG[] for full payment [on the Preferred Equity Units] . . . and SBG must pay JPM remaining cash in excess of what JPM has received through the bankruptcy proceedings."  JPMC failed to note, however, that while retiring DSG's bonds would benefit DSG by reducing its indebtedness, paying down

the Preferred Equity Units provided no value to DSG at all, given that DSG was not an obligor on the Preferred Equity Units.

12.     Nevertheless, JPMC reiterated its advice that SBG should cause DSG to transfer funds to DSIH for the ultimate purpose of "paying down preferred equity" in July 2020, notwithstanding JPM's conclusion four months earlier that DSG had "negative equity value."  Of course, given JPMCFI's ownership of the Preferred Equity Units, JPMC had a pecuniary interest in exploiting its role as Sinclair's advisor to encourage SBG to cause DSG to pay down the Preferred Equity Units as quickly as possible.  JPMC was also unquestionably motivated by a desire to assist its longtime client Sinclair—from which it had earned hundreds of millions, if not billions, of dollars in financing fees—in evading SBG's own obligations under the SBG Guarantee. JPMC's decision to do so materially assisted SBG and DSG's officers and managers in breaching their fiduciary duties to DSG, and renders JPMC itself liable for aiding and abetting those breaches.

13.     In light of the foregoing, DSG brings this action to (i) recover from JPMCFI, under theories of intentional and constructive fraudulent transfer, unjust enrichment, and money had and received, the value of the Subsequent JPMCFI Transfers, and (ii) hold JPMC liable for the damages DSG suffered as a result of the breaches of fiduciary duty JPMC aided and abetted.  DSG had no obligation to fund the Transfers and received no benefit in exchange for making them.  Principles of both law and equity demand that they be returned, and that DSG, and its creditors, be made whole.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O).

15.     This Court has personal jurisdiction over Defendants JPMCFI and JPMC under Federal Rule of Bankruptcy Rule 7004(f).

16.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

<strong><u>PARTIES</u></strong>

17.     Plaintiff is a limited liability company incorporated under the laws of Delaware and has its principal place of business at Sinclair's offices in Hunt Valley, Maryland.  Plaintiff is also a debtor in these Chapter 11 cases, which were filed on March 14 (the "<u>Petition Date</u>").

18.     Defendant JPMCFI is a Delaware corporation and has its principal place of business in New York, New York.  Upon information and belief, JPMCFI has no employees of its own, and/or JPMCFI is operated by employees of JPMC and other JPM entities.

19.     Defendant JPMC is a Delaware corporation and has its principal place of business in New York, New York.

<strong><u>FACTUAL BACKGROUND</u></strong>

**I.      Diamond's Business Operations**

20.     Diamond is the leading provider of local sports programming in the United States. Diamond operates 19 RSNs in markets spanning the United States, which currently operate under the "Bally Sports" tradename.  As of the Petition Date, the Bally Sports RSNs broadcast Major League Baseball, National Basketball Association, and National Hockey League games for 42 teams in their local markets.  Diamond also has joint venture partnerships in Marquee Sports Network ("<u>Marquee</u>"), the local broadcast home of the Chicago Cubs, and the YES Network ("<u>YES</u>"), the local broadcast home of the New York Yankees and the Brooklyn Nets.  Diamond is an important part of the local sports ecosystem in its markets, broadcasting approximately 4,500 local professional sports games annually.  All of Diamond's operations are conducted by direct and indirect subsidiaries of DSG, which is ultimately owned and controlled by SBG.

7

21.     The RSNs' programming has traditionally been delivered by multichannel video programming distributors ("MVPDs" or "Distributors") via cable and satellite, or "linear," broadcast.  The primary driver of revenue for the RSNs has historically been the distribution agreements they negotiate with MVPDs.  Pursuant to these agreements, MVPDs pay the RSNs monthly licensing (or "carriage") fees based in part upon the number of MVPD subscribers in exchange for access to the RSNs' live sports content, which the MVPDs deliver to subscribers.  Examples of MVPDs that have historically carried the RSNs include Charter, Comcast, DirecTV, and DISH Network.  Diamond has also entered into distribution agreements with virtual MVPDs, or streaming services, such as DIRECTV STREAM, Hulu, YouTube TV, Sling, and FuboTV.  The distribution agreements generally require the RSNs to meet certain thresholds (e.g., a minimum number of telecasts per year), and contain fee reduction, rebate, refund, and/or termination provisions in favor of the distributors if the thresholds are not met.

22.     Under the historical linear model, MVPDs bundle multiple channels that are sold as a package to their subscribers.  These bundles typically include the RSNs.  When cable and satellite subscriptions were the primary means for viewers to access television programming, this model was profitable for the RSNs.  The RSNs earned increasing carriage fees from MVPDs driven by higher annual rates while subscriber levels remained stable.

23.     In turn, the RSNs made large payments to their team and league partners for the right to broadcast games and other content.  These agreements generally cover multiple years and grant the RSNs the exclusive right to telecast all local games (other than those that are not selected for exclusive national telecast) within a specified territory (generally the city where the team's arena is located and the surrounding area).  Most of the Diamond RSNs have rights agreements

with at least one MLB and one NBA or NHL team.  Diamond also has agreements with its league partners that provide it with access to certain digital rights.

24.      The RSNs were originally subsidiaries of 21st Century Fox, Inc. ("Fox") and operated as the Fox Sports RSNs.  Fox, including the RSNs, was subsequently acquired by Disney. As part of a settlement of an antitrust lawsuit brought by the Department of Justice, Disney agreed, among other things, to divest the RSNs.

## II.      SBG's Acquisition of the Diamond RSNs from Disney

25.      In 2019, Sinclair acquired the RSNs from Disney based on a value, before non-controlling interests, of approximately $10.6 billion.  The transaction was announced on May 3, 2019 and closed on August 23, 2019.  Sinclair created the Diamond entities for the purpose of consummating the Acquisition and holding the RSNs following the closing.

26.      Sinclair's Acquisition of the RSNs was highly leveraged, with the vast majority of the financing for the purchase funded by third-party debt incurred by Diamond itself.  Specifically, Sinclair caused Diamond to incur $8.2 billion of new debt, consisting of $3.3 billion in secured term loans, $3.1 billion of secured notes, and $1.8 billion of unsecured notes.  The transaction dramatically increased the RSNs' leverage, debt load, and interest burden, requiring Diamond to pay more than $400 million in debt service for each of 2020 and 2021, more than $500 million in 2022, and approximately $650 million in debt service in 2023.

27.      The balance of the financing was provided by a $1.4 billion capital contribution by Sinclair, and $999,375,000 paid by JPMCFI in exchange for $1.025 billion of Preferred Equity Units issued by DSH and guaranteed by SBG.  While Sinclair tried to structure the transaction so that the entirety of the debt used to fund the Acquisition was incurred by DSG, JPM refused to issue additional debt to DSG, and insisted instead that the Preferred Equity Units be issued at the DSH level, above the DSG debt silo, and guaranteed by SBG.  Notably, the Preferred Equity Units

imposed no obligations on DSG itself.  Nevertheless, as discussed in greater detail below, between the Acquisition and the end of 2022, SBG caused DSG to distribute in excess of $900 million to DSIH, to be transferred further up the corporate chain to enable DSH to make quarterly distributions on and fund optional redemptions of the Preferred Equity Units held by JPMCFI, all for SBG's direct benefit.

28.     Diamond's business faced significant headwinds at the time of the Acquisition even apart from the enormous debt load Sinclair imposed on it.  In recent years, the earnings of traditional MVPDs have slumped as many Americans have "cut the cord" on their MVPD subscriptions (or never subscribed to MVPDs in the first place) in favor of watching television programming through streaming services.  This loss of subscribers—known as "subscriber churn"—has materially reduced Distributors' willingness to continue contracting with Diamond or to pay carriage fees at historical levels.  As a result, certain rights fee arrangements with league and team partners have threatened to become uneconomical for the RSNs, as the amounts owed under such agreements are not dependent on the number of subscribers, and instead continue to increase annually.

29.     Even before the Acquisition closed, a major MVPD counterparty and key revenue driver for the RSNs, DISH Network, let its distribution agreement with the RSNs lapse.  DISH Network's chairman, Charlie Ergen, stated publicly that "[i]t doesn't look that the regional sports will ever be on Dish again" because "they're not very good economic deals" for DISH Network and are "overpriced."

30.     Sinclair and JPM were aware of the risk that Diamond would lose DISH Network at the time Sinclair negotiated the Acquisition with Disney.  As early as April 2019, Sinclair's Board was informed of the "risk" that DISH Network could "potentially go[] dark" on the RSNs

during the closing period for the Acquisition.  To account for that risk, Sinclair negotiated a $400 million purchase price adjustment in the event that DISH Network dropped carriage of the RSNs. And JPM cautioned investors against relying on the optimistic view of DISH Network's likelihood of renewal that Sinclair was espousing to them.  Ultimately, DISH Network dropped the RSNs in late July 2019, after Sinclair had agreed to purchase the RSNs but before the acquisition closed, and Sinclair received the $400 million reduction in the transaction purchase price.

### III.    SBG's Post-Acquisition Control of Diamond

31.    At all times between the closing of the Acquisition and May 2022, Sinclair controlled all aspects of Diamond's business.

32.    Between August 2019 and the Petition Date, DSG was an indirect wholly owned subsidiary of Sinclair.  Sinclair owned and controlled DSG through four intermediate holding companies: Diamond Sports TopCo LLC ("TopCo"), DSH, DSIH-A, and DSIH.  Until shortly before the Petition Date, a third party, Byron Allen (a broadcaster whom Smith has known for 30 to 40 years) owned a minuscule 0.003% equity interest in DSIH-A (Sinclair has since redeemed that interest and now owns 100% of the equity in DSIH-A through DSH).  A simplified organizational chart of Sinclair's control over DSG and the ownership structure of the entities as of shortly before the Petition Date is provided below.



33.    SBG controlled DSG's day-to-day operations through its indirect wholly-owned equity interest in DSIH, the sole member of DSG, and the other entities in the chain between DSG and SBG.  DSG was member-managed by DSIH, which was member-managed by DSIH-A, which was managed by a three-member Board of Managers and its sole member, DSH.  DSH—and its subsidiaries, including DSG—were controlled by DSH's three-member Board of Managers.  The DSIH-A and DSH Boards of Managers were made up entirely of SBG executives between DSG's formation in August 2019 through April 2021.  According to the Amended and Restated Limited

12

Liability Company Agreement of DSH dated August 23, 2019, TopCo was "entitled to designate all managers" on DSH's board.  DSG's LLC Agreement also entitled SBG, by way of its control of DSG's sole member, DSIH, to appoint officers of DSG to "manage, control, administer, and operate the day-to-day business and affairs" of DSG.  SBG ultimately controlled DSH through SBG's ownership of TopCo, which was the sole member of DSH.  This ownership structure made SBG the ultimate controller of DSG.

34.     SBG caused the appointment of its own employees and directors as the members of the DSH and DSIH-A Boards of Managers and DSG's senior officers.  As Chris Ripley, Sinclair's CEO, explained, Sinclair "controlled Diamond via employees of [Sinclair] being on the board of Diamond."  Specifically, David Smith, Chris Ripley, and Lucy Rutishauser each served as members of the three-member Board of Managers of DSIH-A and DSH from August 2019 through April 2021.  Each of these individuals served as senior officers of DSG.  As officers of DSG or members of the Boards of DSG's parent companies, all three of these individuals owed fiduciary duties to DSG.

35.     Ripley was installed by Sinclair as the President of DSG and also served as a member of the three-person DSH and DSIH-A Boards.  In his capacity as DSG's President, Ripley was responsible for the daily business and affairs of DSG.

36.     Likewise, Lucy Rutishauser, Sinclair's CFO, was appointed DSG's CFO and Treasurer, and also served as a member of the DSH and DSIH-A Boards.  Rutishauser was the most senior financial officer of DSG.

37.     David Smith, Sinclair's Executive Chairman, served as the third DSH and DSIH-A Board member and had managerial authority over DSG's affairs.  Smith is the direct supervisor of Ripley, who testified that there are "always conversations going on about what is going on at

Diamond . . . with David Smith."  As Executive Chairman of Sinclair, Smith "reserve[s] the right to . . . become involved in whatever [he] choose[s] to become involved in" at Sinclair and its subsidiaries.  Smith receives regular reports on the business and comes into the office every day—Monday through Friday, and weekends as necessary—to deal with Sinclair business.  Smith has consistently directed the affairs of Sinclair and the Diamond entities, including DSG, through his positions on the various Boards of Sinclair entities, and was involved in the decisions to cause DSG to make the Initial Transfers for the purpose of funding the Subsequent JPMCFI Transfers.

38.     Additionally, most of DSG's business operations—including affiliate sales and marketing; legal and business affairs; payroll; finance and accounting; IT support; human resources; and insurance—were required to be provided by Sinclair under a one-sided Management Services Agreement entered into at the closing of the Acquisition in consideration for outsized fees paid by DSG.

39.     Although Smith, Ripley, and Rutishauser all sat on the Boards of DSIH-A and DSH from August 2019 to April 2021, and in those positions, caused DSG to engage in a number of payments and transactions worth well over a billion dollars, those individuals were largely unable to recall any meetings of those Boards at which those transactions were discussed or authorized.  Indeed, they were either unable to recall even serving as a director of a Diamond entity board or recalled only that DSG's affairs were largely conducted through "informal meetings" or as part of SBG Board meetings.

40.     For instance, when asked if he had any recollection of serving on or participating in the boards of any Diamond entities, Smith responded: "I have no particular recollection [] of that actually happening" and "[i]f I did, it was only by virtue that it was at the Sinclair board, and there may have been a [] common activity at that meeting, at a Sinclair meeting," but he had "no

particular recollection of having a separate, discrete board meeting on behalf of Diamond."  Nor

could Smith ever remember seeing any minutes of any Diamond entity's board meetings.  Smith

was only able to recall a single telephonic meeting of Diamond's Board, which took place in

November 2020—more than a year after the Acquisition closed, and after the majority of the

relevant transactions were authorized.  Ripley confirmed that "[f]or wholly-owned subsidiaries

with internal boards, [Sinclair] never produced minutes," and he stated that there were only

"informal meetings" of the Diamond entity boards, but no memorialization, notes, or other

documentation evidencing such meetings.  Similarly, Rutishauser testified that she was "not sure

which board of members that [she] was on."

41.      Smith also candidly acknowledged Sinclair's total control over DSG. He testified

that he

> viewed Diamond as essentially really nothing more than another television station
> that we owned. We owned a hundred percent of it. We treated it like we owned a
> hundred percent of it, so I treated it like every other business that I own. . . . I view
> Diamond as essentially one and the same as Sinclair, even though I know
> technically as a matter this is a subsidiary of some sort. But the fact of the matter is
> I treated it like it's mine. . . . Notwithstanding the different credit stacks, I still view
> them as one and the same from my perspective.

42.      When pressed to explain how his view of Diamond as "one and the same as

Sinclair" comported with his dual fiduciary duties to Sinclair and DSG, Smith reiterated his view

that "as a hundred percent shareholder, I viewed it as one and the same."  Smith was unable to

recall a single discussion about any actual or potential conflict of interest between Sinclair and

DSG considering the dual fiduciary duties that Smith, Ripley, and Rutishauser owed.

43.      Similarly, Rutishauser was unable to articulate how, if at all, she managed conflicts

of interest as a fiduciary for the various companies for which she was an officer or manager when

their interests diverged.

44.     Ripley acknowledged that he owed fiduciary duties to both Sinclair and Diamond and that it was "impossible for there to be always aligned interests" between Sinclair and Diamond, and that conflict "is inevitable in any situation like this."  Ripley even conceded that "any instance where money would have left the [DSG] system," such as the "distributions of cash" from DSG, would have constituted examples of misaligned interests between Sinclair and Diamond. However, Ripley was also unable to identify any process that was used to manage these "inevitable" conflicts of interest between DSG and Sinclair, including Sinclair's Related Party Transaction procedures, claiming that it "just wasn't necessary."

45.     In April 2021, DSG's limited liability company agreement was amended to establish a three-member Board of Managers at the DSG level.  Between April 2021 and May 2022, a majority of DSG's board members were unaffiliated with SBG, but were subject to removal by SBG at any time.

**IV.     Diamond's Business Prospects Continue to Deteriorate**

46.     Between the August 2019 closing of the Acquisition and the Petition Date, Diamond's business dramatically deteriorated.  Diamond's revenues continued to be impacted by cord-cutting and continually increasing sports rights payments.

47.     By late 2019, it was apparent that Diamond was insolvent.  Diamond had no realistic prospect of negotiating a new long-term distribution agreement with DISH Network, and other major MVPDs, including YouTube and Hulu, chose to let their existing agreements with the RSNs expire approximately a year after the Acquisition.

48.     Additionally, beginning in March 2020, when the major sports leagues cancelled games for an indeterminate period due to the COVID-19 pandemic, DSG faced dramatically reduced distribution revenue while saddled with large, fixed-payment obligations.  Nonetheless, throughout this period, SBG caused DSG to pay hundreds of millions of dollars in dividends to

DSIH for the ultimate purpose of satisfying DSH's and SBG's obligations to JPMCFI under the Preferred Equity Units.

### A. The Irretrievable Loss of DISH Network

49.     Just one month before the Acquisition closed, in July 2019, DISH Network, one of the largest and most important players in the Distributor market and one of only two national satellite operators, dropped carriage of the RSNs.  Sling TV, which is owned by DISH Network, also dropped carriage of the RSNs at or about the same time.  Historically, DISH Network had been a critical Distributor for the RSNs, accounting for approximately $350 to $400 million in annual distribution revenue, which accounted for approximately 10% of the RSNs' total revenue and some 20% of their EBITDA.

50.     DISH Network pulled the Diamond RSN broadcasts in the midst of baseball season, which is the season with the most attractive and valuable content broadcast on the RSNs.  The fact that DISH Network was willing to abandon the RSNs in the midst of the most popular season— when its customers would be most affected by that decision—neutralized Sinclair's biggest leverage point and minimized the chances of DISH Network ever returning.

51.     Immediately after DISH Network dropped the RSNs, DISH Network executives, including its Chairman, Charlie Ergen, made public statements to the market making clear that the decision to discontinue the RSNs was likely permanent.  Ergen commented during a July 2019 earnings call that the RSNs are "not very good economic deals for us"; there are only "a very small fraction of our customers that are avid viewers of the regional sports"; since DISH Network had already dropped the RSNs and "lost the customers that want" to watch the RSNs, it "[m]akes no sense" to add the RSNs back, and therefore, "it doesn't look that the regional sports will ever be on DISH again."  On the same call, Warren Schlichting, Group President of Sling TV, a subsidiary of DISH Network, made similar comments, stating that the RSN model "is broken" and "not a

good deal," and that DISH Network had "real data" that showed carrying the RSNs was "an expensive gamut [sic]," such that his recommendation was to "leave those RSNs off the service long term."

52.     Not surprisingly, in light of these unequivocal statements by DISH Network's senior executives, analysts and investors concluded that DISH Network was unlikely to return as a DSG distributor.  In December 2019, Wells Fargo expressed the view that "the market prices in as little as 10% chance that DISH comes to terms on the RSNs."  And the market understood that without DISH Network, the RSNs had "limited or no value."  In February and March 2020, JPM and Wolfe Research issued analyst reports on Diamond assuming that DISH Network would not return.  And in May 2020, Morningstar stated that "Dish and its iconoclastic chairman, Charlie Ergen, is likely to refuse to revive the expired carriage contract this year and even beyond."  Even Sinclair's Executive Chairman, Smith—a personal acquaintance of Ergen—agreed that, "[k]nowing Charlie, there's nothing to change with Charlie when he makes up his mind."

53.     Sinclair was aware as early as September 2019—a month after the Acquisition closed—of the risk that DISH Network would drop the RSNs, and assumed a $400 million reduction in RSN EBITDA per year in its internal modeling.  Additionally, although Sinclair attempted to negotiate a new deal with DISH Network for the carriage of the RSNs, it was at all times apparent that DISH Network was not interested in carrying the RSNs on terms that would be remotely acceptable to Sinclair or Diamond.  █████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████

54.     Between October 2019 and April 2020, Sinclair and DISH Network exchanged counter proposals for a global deal encompassing Sinclair's broadcast stations as well as the Diamond RSNs.  But the parties remained far apart.  On November 6, 2019, Ripley announced on Sinclair's Q3 2019 earnings call that because Sinclair "can't predict whether or when we will get a carriage deal done with [DISH Network] for the RSNs, we've removed DISH affiliate fees from our forecast until we have a better sense of timing and terms of any such resolution."  Similarly, at a special meeting of Sinclair's board on December 12, 2019, the board "requested DISH be taken out of the budget for RSNs since timing of the relaunch of the contract was still to be determined."

55.     ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

19

56.     In early February 2020, Ergen, DISH Network's CEO, again publicly confirmed that DISH Network would not be entering into a new agreement to carry the Diamond RSNs. During DISH Network's earnings call, an analyst asked whether there was "any reason to think that this wasn't a great decision" for DISH Network to drop the RSNs, given that DISH Network was "saving over $400 million a year on not having those RSNs" and had "lost, at most, $30 million to $40 million . . . of EBITDA from the sub[scriber] losses" who switched to other distributors. Ergen responded that the number of DISH Network subscribers who are regional sports fans are a "fraction" of what they were before DISH Network dropped the RSNs and there was "no reason to put it back and tax the rest of the people."

57.     During February and March 2020, DISH Network and Sinclair exchanged counter-proposals for a global deal that would include carriage of the Diamond RSNs as well as Sinclair's broadcast stations. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

58.     In 2021, Sinclair once again engaged DISH Network in efforts to negotiate a deal that included carriage of the Diamond RSNs. ████████████████████

███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████

59.     ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

### B.  Diamond Loses Additional Major Distribution Channels

60.     DSG's relationships with virtual MVPDs, such as YouTube and Hulu, were similarly imperiled by early 2020.

61.     In February 2020, ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

As a result of Faber's warning, Rutishauser instructed other Sinclair finance personnel to remove expected YouTube revenue from internal projections, leading to a reduction in projected revenues for the RSNs of nearly $90 million for March through December 2020.

62.     Later in February, Faber emailed YouTube that SBG had ████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████

63.     Ultimately, YouTube was willing to enter a short-term contract extension in a deal that allowed YouTube to pick and choose which RSNs it would carry—a highly unusual deal for Diamond that raised "a great deal of concern" and "a number of investor questions."  As SBG's Vice President of Investor Relations, Steven Zenker, told Faber on March 10, 2020, ███████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ Zenker also questioned whether the YouTube deal

would have an impact on any future deal with Hulu, to which Faber responded that Diamond "will

be extremely lucky if Hulu and YouTube carry after the end of the summer."

64.     When Faber attempted to negotiate a new deal with YouTube as the short-term

extension was set to expire, Faber conveyed that ████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

65.     As Faber had predicted, both YouTube and Hulu dropped carriage of Diamond's

RSNs by the fall of 2020.  In a draft Q&A prepared for the fourth quarter 2020 earnings call, Faber

explained that Hulu and YouTube ████████████████████████████████████

████████████████████████

### C.  Impact of COVID-19

66.     On March 12, 2020, as a result of the onset of the COVID-19 pandemic in the

United States, MLB announced that the remainder of Spring Training was cancelled and that the

start of the 2020 regular season would be delayed by at least two weeks.  This delay of sports

programming substantially reduced Diamond's distribution and advertising revenue, which is

dependent upon games actually being played and televised.

67.     Following the shutdown of live sports, DSG's debt trading prices dropped more

than 30 percent.  Investors became increasingly concerned about Diamond's liquidity and

covenants, particularly in light of the company's "fixed costs, including interest payments[.]"

### V.     DSG Was Insolvent By At Least December 2019 (And Possibly Earlier)

68.     The information currently available to DSG shows that Diamond was insolvent by at least as early as December 2019, and possibly earlier.  By December 2019, DISH Network had dropped distribution of the RSNs, and it was apparent that YouTube and Hulu were unlikely to agree to long-term renewals of their distribution agreements.  The fundamental economics of Diamond's business model were shifting from underneath it, and significant cash was leaving Diamond's accounts for SBG's coffers through the one-sided management services agreement that SBG had unilaterally imposed on Diamond, which significantly favored SBG to DSG's detriment. As shown below, by March 2020, Diamond's secured and unsecured debt was trading materially below par, reflecting the market's grave doubts about Diamond's ability to pay its debts when due. And by September 2020, a valuation of DSG performed in connection with Sinclair's financial statements forced Sinclair to take a multi-billion-dollar goodwill impairment that left DSG with $2.5 billion in negative equity value.

69.     The startling decline in Diamond's prospects is reflected in repeated reductions in Diamond's projected EBITDA in Sinclair's internal forecasts.  Between late April 2019, when Sinclair agreed to purchase the RSNs, and February 2020, ten month later, Sinclair's forecasts for the RSNs' 2020 EBITDA before the payment of management fees payable to Sinclair declined from $1.505 billion to $1.006 billion—a staggering decline of more than 30%.  By July 2020, five months later, Sinclair forecast 2020 EBITDA for Diamond of only approximately $750 million, another approximately 25% decline.

70.     Between late April 2019, when Sinclair agreed to purchase the RSNs for $10.6 billion, and when the Acquisition closed in August 2019, Sinclair's financial advisor, Guggenheim Securities, and Sinclair's own internal corporate development team consistently projected 2020 EBITDA of over $1.5 billion, or $1.4 billion net of management fees.  This was the figure

presented to the Sinclair Board of Directors during the meeting in which the Sinclair Board authorized the purchase of the RSNs; provided to potential lenders when raising debt to finance the transaction; and presented to ratings agencies to obtain ratings for Diamond's debt.

71.     Almost immediately after the transaction closed, however, Diamond's business began to rapidly decline.  And when Sinclair removed DISH Network from the projections following the November 6, 2019 earnings call, Diamond's projections plummeted.  On November 12, 2019, Justin Bray, Sinclair's Treasurer, emailed Rutishauser updated projections for DSG's attributable EBITDA forecast for 2020.  The removal of DISH Network and the continued deterioration of the RSN business model resulted in new attributable EBITDA projections for 2020 of approximately $1 billion—roughly $500 million less than Sinclair's projections just five months earlier.

72.     Notwithstanding this precipitous decline in projected EBITDA, Sinclair saw fit to cause DSG to transfer to DSIH, for the benefit of SBG, over $300 million on December 13, 2019 and close to $200 million on January 20, 2020, as well as additional, smaller distributions totaling $27.5 million between September 2019 and January 2020 for the same purpose.  Sinclair forced these distributions over the recommendation of Bray, who advised in early November 2019 that any distributions from DSG "should wait until February" 2020 because the "2020 forecast will be more clear at that point."  At her deposition, Rutishauser confirmed that, as Treasurer, Bray's job is to "monitor liquidity for the company" and that she "would expect him to have some input" in decisions regarding DSG's distributions.  Nonetheless, between December 2019 and January 2020 Sinclair proceeded to distribute over $500 million of DSG's cash to DSIH, for ultimate payment to JPMCFI for SBG's benefit, over Bray's recommendation.

73.     Sinclair's internal EBITDA projections for DSG continued to decline in early 2020. When Sinclair set the 2020 budget in December 2019, Diamond's 2020 EBITDA was projected at $1.1 billion before management fees, or $996 million after management fees.  By February 25, 2020, when Sinclair finalized its year-end financials and updated its projections for 2020, DSG's forecasted 2020 EBITDA had declined another $90 million to $1.006 billion, or only $902 million after management fees.

74.     In April 2020, standard solvency tests, including those conducted by senior Sinclair finance personnel, showed that DSG was insolvent.   On April 21, 2020, Billie-Jo McIntire, a Director in Sinclair's Finance Department, emailed Rutishauser and Ripley a multi-year financial model for DSG showing projected 2020 DSG EBITDA of $931 million.   McIntire's model included cash flow coverage and balance sheet/asset value solvency tests.  The model showed that DSG "[f]ail[ed]" these tests, indicating that it was insolvent.  McIntire bluntly told Rutishauser and Ripley that "[i]t doesn't look good on any of the [solvency] tests."  McIntire was still making changes to the model's inputs in June 2020, but the solvency tests were still showing that DSG was insolvent.

75.     DSG's financial performance under Sinclair's stewardship continued to deteriorate in the following months.  In an email Rutishauser sent to Ripley in July 2020 with the subject line "DSG true P/L," Rutishauser informed Ripley that DSG's "true adj[usted] ebitda" forecast for 2020 was now down to $658 million after management fees, which equates to $627 million after subtracting $31 million in projected EBITDA attributable to Diamond's joint venture partnership in Marquee Sports Network ("Marquee").  Rutishaser attributed this massive additional decline in EBITDA to decreased distribution revenues, which were "down $320M vs budget," as well as significantly increased subscriber churn.

76.     The below chart illustrates the significant decline in Sinclair's forecasts of DSG's 2020 EBITDA (after management fees and excluding revenue from Marquee) that occurred between April 2019 and July 2020:



77.     Nonetheless, even in the face of this continuous and precipitous decline in DSG's projected EBITDA, Sinclair caused DSG to issue more than $350 million in distributions to DSIH, for SBG's benefit, on August 18, 2020—less than a month after Rutishauser emailed Ripley that DSG's "true P/L" was hundreds of millions of dollars less than anticipated at the beginning of the year.  Sinclair also caused DSG to issue over $24 million in additional, smaller distributions to DSIH, for SBG's benefit, between January 2020 and August 2020.

78.     SBG publicly acknowledged that DSG's fair value was less than the amount of its debt—a clear acknowledgement of insolvency—as of the third quarter of 2020 (ending September 30, 2020).  As part of the reporting of SBG's quarterly financial results, KPMG, SBG's auditors, conducted an impairment analysis of goodwill associated with the Diamond acquisition.  KPMG concluded that the value of DSG's reporting units was $4.4 billion, resulting in a write-down of

DSG's goodwill.  Consistent with this analysis, DSG recorded a $4.2 billion impairment in the third quarter of 2020, resulting in a negative equity value of $2.5 billion.  Likewise, Sinclair's internal forecasting from December 2020 showed that DSG had no equity value.

79.     As Sinclair disclosed on November 4, 2020, the impairment

was driven by a decline in distribution revenue brought on by a number of factors, including the recent loss of two virtual distributors, that together represented approximately 10% of the [the RSNs'] gross distribution revenue for the month of September 2020, as well as elevated levels of subscriber erosion influenced by numerous factors including fragmentation of content distribution platforms, shifting consumer behaviors due to the current economic environment, the COVID-19 pandemic, and related uncertainties.

80.     Even after publicly disclosing this extraordinary write-down, Sinclair continued to cause DSG to issue distributions to DSIH for SBG's benefit.  Between September 29, 2020 and the end of 2022, Sinclair forced DSG to issue additional distributions to DSIH, for SBG's benefit, of close to $19 million.

81.     The market also recognized that DSG was insolvent.  By December 2019, Diamond's unsecured debt was trading below par.  And by mid-March 2020, following the COVID-driven shutdowns of live sporting events, the trading prices of DSG's debt plummeted precipitously.  The trading price of DSG's secured notes due 2026 fell to $0.66, and the trading price of its unsecured notes due 2027 fell as low as $0.49.  These prices never recovered; from March 6, 2020 through the Petition Date, DSG's secured notes never again traded above $0.90, and from June 11, 2020, through the Petition Date, its unsecured notes never traded above $0.70.  A chart illustrating this precipitous decline is below.  These prices reflect the market's view that DSG would not be able to pay its debts when due.



82.     Commentary by market analysts further reflects the market's understanding that Diamond was insolvent, even long before the impact of COVID-19 was felt.  As early as December 18, 2019, Wells Fargo estimated that DSG's leverage exceeded its value based on the purchase price multiple paid by Sinclair.  In other words, DSG had a negative equity value as early as December 2019.  Recognizing the declining value in DSG, a major alternative asset manager launched a short position in the unsecured bonds of DSG as part of its long/short credit fund portfolio, noting in the December 13, 2019 announcement of its position that DSG's bonds were one of the "most shorted bonds in the high yield market."

83.     Other analysts expressed the same view.  On December 31, 2019, an analyst sent Rutishauser "notes from a dinner event, where investors present to one another various short ideas."  The presenter made the case for shorting both SBG's stock and DSG's unsecured bonds, and estimated (correctly) that DSG's forecasted EBITDA as of December 2019 was ~$900 million, as opposed to its prior forecasted EBITDA of $1.5 billion.  Rutishauser forwarded the analyst's

notes to Ripley and Faber and commented that Sinclair has "been busy beating these talking points back."

84.     By March 2020, a consensus of other analysts expressed a similarly bleak outlook. For example, in February 2020, an analyst from Goodnow Investment Group estimated DSG's 2020 forecasted EBITDA to be $945 million and concluded that without DISH Network, "SBGI's equity investment in [Diamond] looks highly likely to be a zero," and DSG "will be challenged to avoid a bankruptcy/debt restructuring event down the road."  On March 4, 2020, JPM noted that SBG was "now trading well below pre-Fox RSN deal levels . . . reflecting in our view a lack of market confidence in management's outlook for the acquired networks."  JPM further noted that investors were "attributing little or no value to the RSNs" and that under JPM's valuation assumptions, DSG had "negative equity value," making it "unclear when the [Diamond] silo can dividend cash back to the holding company."

85.     On March 12, 2020, Wells Fargo expressed the view that "there is negative equity value at Diamond if cash flow remains constant," and noted that "our operating model . . . implies a more severe gap."  Wells Fargo noted that the "DISH drop and YouTube renewals have left investors worried about RSN earnings and leverage going forward."  Although Wells Fargo deemed it "too early to call for a solvency issue," the report ascribed "zero RSN value" to SBG given Diamond's staggering debt burden.

86.     Analysts continued to express similar views as 2020 progressed.  On May 6, 2020, Wells Fargo opined that the RSNs under Diamond "could soon be restructured with bondholders."  On August 6, 2020, Wolfe Research indicated that its price target for SBG "attributes zero equity value to the RSN business."

87.     Additionally, as of June 30, 2020, the 5.375% Senior Secured Notes due in 2026 traded at $0.73, while the 6.625% Senior Unsecured Notes due in 2027 traded even lower, at $0.54, signaling that the market viewed Diamond as insolvent.

**VI.     The Transfers**

88.     Although DSG had no obligations with respect to the Preferred Equity Units, beginning in September 2019—little more than a month after the Acquisition closed—and continuing through the end of 2022, SBG caused DSG to make distributions to DSIH, for the purpose of transferring the distributions further up the corporate chain and ultimately (after paying a dividend to Byron Allen, who held a small equity interest in DSIH-A) to JPMCFI to satisfy DSH's (and SBG's) obligations on the Preferred Equity Units and to voluntarily redeem the Preferred Equity Units.  The Transfers total approximately $929 million in cash, $70 million of which was ultimately used to make quarterly distributions to JPMCFI and $859 million of which was ultimately used to fund optional redemptions of the Preferred Equity Units.  DSG received no consideration or benefit in exchange for making the Initial DSIH Transfers or as a result of the Subsequent Transfers.

89.     Because SBG guaranteed DSH's obligations under the Preferred Equity Units, and DSH had no source of value other than its indirect equity interest in DSG, SBG directly benefitted by causing an insolvent DSG to make distributions to DSIH that were ultimately used to fund transfers to JPMCFI.  Once SBG was aware that DSG was insolvent (and therefore SBG's equity interest in DSG was wiped out), SBG had every incentive to use DSG funds to make payments due under the Preferred Equity Units and to redeem those units.  The alternative—to allow DSG's value to be used to pay down DSG debt that SBG had not guaranteed—would have left SBG as the only source of payment on the Preferred Equity Unit obligations.

90. A chart setting forth the dates and known amounts of the Initial Transfers and Subsequent JPMCFI Transfers is set forth below.[5]

| Date | Initial Transfer Amount | Subsequent JPMCFI Transfer Amount |
|---|---|---|
| 9/30/2019 | $10,183,879.57 | $10,183,526.19 |
| 12/13/2019 | $306,582,971.43 | $301,872,333 |
| 12/31/2019 | $17,401,842.72 | $16,919,089.38 |
| 1/20/2020 | $198,538,098.16 | $198,531,208.89 |
| 6/30/2020 | $23,887,929.76 | $23,749,074.85 |
| 8/18/2020 | $353,862,279.02 | $353,843,005 |
| 9/29/2020 | $3,609,500.25 | $2,508,408 |
| 12/31/2020 | $3,609,500.25 | $3,597,063 |
| 3/31/2021 | $3,609,500.25 | $3,608,378 |
| 9/30/2021 | $218,749.74 | $217,306.00 |
| 12/31/2021 | $1,267,258.86 | $1,258,895.00 |
| 3/31/2022 | $1,248,954.05 | $1,240,711.00 |
| 6/30/2022 | $1,322,428.16 | $1,313,700.18 |
| 9/30/2022 | $1,646,532.05 | $1,635,665.00 |
| 12/30/22 | $1,910,779.71 | $1,898,168.63 |
| **Total** | **$928,900,203.99** | **$922,376,532.12** |

### A. Terms of the Preferred Equity Units

91. The terms of the Preferred Equity Units are set forth in the LLC Agreement of DSH (as amended and restated, the "LLC Agreement") and the Guaranty of Collection between SBG and JPMCFI. DSG is not a party to either agreement.

92. Under Section 4.2 of the LLC Agreement, DSH was required to make quarterly payments to JPMCFI on account of the Preferred Equity Units. The amount of the payments—functionally equivalent to interest on a loan—was based upon the number of Preferred Equity Units outstanding multiplied by a rate determined by the agreement. The rates increased modestly

---

[5] Based upon the information that is currently available to it, DSG is not challenging the September 30, 2019 Subsequent JPMCFI Transfer. DSG reserves its right to amend or seek to amend the complaint to challenge this Transfer should it become aware of a factual basis on which to do so.

over time.  Quarterly distributions could be made, at DSH's election, in cash or in the form of additional Preferred Equity Units.

93.     The Preferred Equity Units could be redeemed by DSH at its election at any time starting 91 days after the closing of the acquisition.  Redemption payments were required to be made in cash, and the amount of the required redemption payment was determined by the face amount of the units redeemed plus a call premium of 1–3%; no call premium was required for redemptions made more than four years after the closing date.

94.     While JPMCFI had the right to force the redemption of any outstanding Preferred Equity Units, that right could not be exercised until August 23, 2027, eight years after the Acquisition closed.

### B.  The SBG Guaranty

95.     SBG issued a Guaranty of Collection in JPMCFI's favor, by which SBG guaranteed JPMCFI's collection of DSH's obligations under the Preferred Equity Units.  DSG had no obligation to JPMCFI or anyone else with respect to the Preferred Equity Units.  Because SBG guaranteed DSH's obligations under the Preferred Equity Units but did not guarantee DSG's debt, the Transfers directly benefited SBG at the expense of DSG and its creditors.

### C.  Mechanics of Distributions and Purported Solvency Certifications

96.     Payments to JPMCFI for redemptions and mandatory quarterly distributions were structured and approved as distributions by DSG to its immediate parent DSIH, and then as subsequent distributions or payments to DSIH-A, DSH, and JPMCFI.

97.     The decisions as to when to redeem the Preferred Equity Units, the number of units to redeem in a particular redemption, and whether to pay the quarterly interest payments in cash or in kind, were made by Ripley or other senior officers of SBG, together with the SBG-controlled

boards of managers of DSH and DSIH-A, which governed the affairs of DSG.  No independent representative of DSG was involved in the decisions.

98.    The distributions were also accompanied by written consents of the boards or managers of DSH, DSIH-A, DSIH, and DSG, which described the sequential distributions as follows:

> **WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Group, LLC, DSG shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;
>
> **WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings LLC, DSIH shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;
>
> **WHEREAS**, pursuant to Section 3.2 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings A, LLC, DSIHA shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the Manager, DSH, in its sole and absolute discretion;
>
> **WHEREAS**, pursuant to Section 4.2 of DSH Operating Agreement, DSH shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the board of directors in its sole and absolute discretion;

**WHEREAS**, it has been proposed that DSG make a distribution in an amount equal to $353,862,279.02 (the "DSG Distribution") to DSIH;

**WHEREAS**, it has been proposed that DSIH make a distribution in an amount equal to $353,862,279.02 (the "DSIH Distribution") to DSIHA;

**WHEREAS**, it has been proposed that DSIHA make distributions to its members, DSH and Byron Allen Folks, in an aggregate amount equal to $353,862,279.02 (the "DSIHA Distribution"), to be distributed to each member on a pro rata basis in proportion to their holdings of DSIHA;

**WHEREAS**, it has been proposed that DSH make a distribution to its Preferred Member, JPMorgan Chase Funding, Inc., in an amount equal to $353,843,005 (the "Preferred Distribution," and together with the DSG Distribution, the DSIH Distribution and the DSIHA Distribution, the "Distributions") in accordance with Section 4.2(a) of the Limited Liability Company Agreement of Diamond Sports Holdings LLC (the "DSH Operating Agreement");

**WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Group, LLC, DSG shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;

**WHEREAS**, pursuant to Section 6.1 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings LLC, DSIH shall make distributions of cash or property to its sole member in such amounts and at such times as shall be determined by the sole member in its sole and absolute discretion;

**WHEREAS**, pursuant to Section 3.2 of the Limited Liability Company Agreement of Diamond Sports Intermediate Holdings A, LLC, DSIHA shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the Manager, DSH, in its sole and absolute discretion;

**WHEREAS**, pursuant to Section 4.2 of DSH Operating Agreement, DSH shall make distributions of cash or property to its members in such amounts and at such times as shall be determined by the board of directors in its sole and absolute discretion;

99.    SBG recognized that it could not rightfully cause DSG to make distributions to DSIH if DSG was insolvent at the time of the distribution or if the distribution would render it insolvent. ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████    Accordingly, for each such distribution, Lucy Rutishauser, Diamond's "Treasurer and most senior financial officer," who was also the CFO of SBG and a member of the DSH and DSIH-A Boards of Managers, issued an Officer's Certificate attesting to DSG's solvency at the

time of and after the contemplated Initial DSIH Transfer.  Notwithstanding that certification, however, Rutishauser acknowledged that she is "not a solvency expert" and "can't say whether [Diamond] was solvent" at the time of the Transfers that occurred prior to August 2020 because SBG "only did the one solvency analysis in 2020."  In fact, Diamond was insolvent at the time of, or rendered insolvent by, each Initial Transfer that was made on or after December 13, 2019.

### D.  Empire's Solvency Opinion

100.    On August 4, 2020, in connection with a planned distribution of $535 million from DSG to DSIH, and subsequently to DSIH-A, DSH, and JPMCFI, SBG obtained a solvency report from a firm called Empire Valuation Consultants ("Empire"), which has never opined that any entity is insolvent since its founding in 1988.  While Empire concluded that DSG would be solvent after giving effect to the distribution, its opinion rested on unreasonable assumptions that were inconsistent with Sinclair's contemporaneous internal estimates and the views expressed by market analysts.  Sinclair also deliberately withheld certain information from Empire, including what Rutishauser described as Diamond's "true P/L."  When Empire's corporate witness learned of this concealment at his deposition, he described it as a "material omission."  Applying Empire's analysis to assumptions that are consistent with Sinclair's own internal assumptions would have resulted in a finding that DSG was insolvent.

101.    Among the multiple unrealistic assumptions on which Empire's opinion rested were the following:

102.    *First*, the revenue and EBITDA projections for DSG that Sinclair provided and Empire relied on assumed the "[r]eturn of DISH Network in April 2021," the start of the 2021 baseball season.  Even Empire's purported "downside case" assumed that DISH Network would resume carriage of the RSNs at the latest by August 2021.  Empire applied no risk adjustment to this assumption—*i.e.*, it valued DSG on the assumption that DISH Network was certain to return.

Sinclair acknowledged that Empire was not "vouching for the reasonableness of the assumption about obtaining DISH [Network] as a customer," and Empire made clear that it based that assumption entirely on the "case" made by Sinclair's management. However, even Sinclair management was not willing to back a "100 percent chance likelihood" that DISH Network would return, with Billie-Jo McIntire—who maintained Sinclair's internal financial models—calling a 100% assumption "unusual."

103.    The assumption embedded in the projections that Sinclair provided to Empire that DISH Network would return was wholly unrealistic and contrary to DISH Network's public and private statements, Sinclair's internal assessments, KPMG's contemporaneous impairment testing, and the views of industry analysts.

104.    The assumption that DISH Network would return is also inconsistent with the goodwill impairment analysis conducted by KPMG. KPMG's analysis began around the same time as Empire's analysis and solvency report. But unlike Empire's solvency analysis, KPMG's goodwill impairment analysis did not assume that DISH Network would ever carry the RSNs again. Rather, KPMG told Sinclair that "if dish doesn't exist now, a buyer wouldn't be buying that relationship if sold and would have to negotiate themselves, so [revenue from DISH Network] wouldn't be in [fair value] now."

105.    David Bochenek, Sinclair's Chief Accounting Officer, testified that the Empire and KPMG assumptions regarding DISH Network were not consistent, and agreed that it was reasonable for KPMG to exclude revenue from DISH Network in the impairment testing. Derek Nance, Sinclair's Assistant Corporate Controller, also shared this sentiment, stating in an October 12, 2020 email to KPMG that because Diamond did "not have a deal negotiated [with DISH

Network] yet," he had "a hard time saying [it's] an intangible asset" that should be included in KPMG's analysis.

106.    Empire's corporate representative confirmed that although Empire was not shown the projections provided to KPMG, Empire "assumed that the projections would be consistent." Rutishauser likewise stated that it was important that the assumptions underlying the solvency analysis and the impairment analysis be consistent.  They were not, though, which led to the paradoxical world in which Empire concluded DSG was solvent enough to issue half a billion dollars in distributions to its corporate parent, but KPMG's impairment testing concluded that Diamond needed to take a $4.2 billion goodwill impairment.

107.    At their depositions, neither Rutishauser nor Bochenek was able to articulate a concrete reason why it would be reasonable for Empire to conclude that DISH Network would return for purposes of the solvency analysis but for KPMG to conclude that DISH Network would not return for purposes of the impairment analysis.  Neither deponent was aware of any changes in Sinclair's negotiations with DISH Network between the date Empire issued its report and the date Sinclair announced the goodwill impairment based on KPMG's testing that would have justified the discrepancy.  And indeed, there were no such changes in Sinclair's negotiations with DISH Network between those two dates.

108.    The assumption that DISH Network would return was critical to Empire's solvency conclusion.  Empire's corporate representative described the likelihood of DISH Network returning as "important" because DISH Network provided "sizeable additional income coming back into the company" to the tune of hundreds of millions of dollars each year.  In particular, Empire's model assumed DISH Network would contribute approximately $300 million of annual revenue to DSG upon its return; in accordance with Empire's analysis, that equates to

approximately $2.1 billion in overall enterprise value. ***Assuming that DISH Network would not return would have flipped Empire's solvency conclusion even if no other changes were made to its analysis.*** Sinclair itself acknowledged that the assumption that DISH Network would return was "fundamental to the [solvency] conclusion" reached by Empire.

109. ***Second***, Empire's analysis included distribution revenue from two other major distributors, Hulu and YouTube. This was despite the fact that—as discussed above—internal documents show that ███████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████ The inclusion of projected revenue from Hulu and YouTube was critical to Empire's finding of solvency. Indeed, Empire's corporate representative testified that removing Hulu and YouTube would have "created a big problem for the transaction," and given the "magnitude of the change" of losing both Hulu and YouTube, DSG "wouldn't have passed solvency had [Empire] known all that." In fact, DISH Network never returned, and Hulu and YouTube let their contracts with Diamond expire in October 2020.

110. Empire was not aware that Sinclair did not believe Hulu and YouTube would sign a long-term renewal agreement for the Diamond RSNs. In fact, Empire was not even aware that Hulu and YouTube were up for renewal. When asked whether it would have been important for Empire to know that Sinclair believed it would be "extremely lucky if Hulu and YouTube carried [the RSNs] after the end of the Summer," the Empire corporate representative said that he "would have wanted to know about it" since projected revenue from Hulu and YouTube were still in Empire's projections. Indeed, Empire had actually asked Sinclair for information about Diamond's "existing relationships with carriers" and whether there was "any pushback on your

rates charged to the carriers."  Instead of preparing a truthful response about the risk that YouTube and Hulu would not renew their carriage agreements by the Fall of 2020, Sinclair prepared talking points that conveyed to Empire that it had "good, long-term relationships with our carriers" and that the carriers "understand the valuable content we bring to their businesses."

111.   **Third**, Empire's EBITDA forecasts, which relied upon a model provided by Sinclair, were materially higher than those used internally by the company, and Sinclair withheld from Empire its own lower forecasts.  In connection with Empire's opinion, Rutishauser, as the CFO of Diamond, was requested to, and did, provide Empire with a management representation letter certifying that the "financial projections" provided to Empire were "prepared in good faith and are based upon assumptions which are believed by management to be reasonable at the time such projections were made."  Rutishauser was also asked to confirm "that there are no other projections covering the same period."

112.   These representations were false.  The model Empire used projected Diamond EBITDA above $1 billion for 2021.  But Rutishauser informed Ripley in late July 2020 that Diamond's "True P/L" showed an EBITDA of $775 million for 2021—more than 20% lower.  When shown Rutishauser's email, Empire's corporate designee testified that Empire would have wanted to know if Sinclair believed Diamond had a lower projected EBITDA than what was supplied to Empire "[b]ecause it would have affected the starting point" for Empire's work, Empire "would have asked for different projections," and Empire "wouldn't have delivered an opinion" on August 4, 2020 based on stale projections.  He testified further that he viewed the fact that Sinclair did not provide these "true" projections as a "material omission."

113.   In that same internal email (which was not shared with Empire), Rutishauser further warned that the loss of distribution revenues for DSG resulted in financials down "$320M vs

budget" and that "the Street will do this math, as well because they will see the MVPD rebates and the change in team [rights payments] and assume that ex-Dish and Marquee, this is a $700 ebitda business." But at Rutishauser's direction, Sinclair hid from Empire the fact that its internal models showed a much lower EBITDA forecast for 2021 compared to Empire's model.

114.    **Fourth**, Empire's overstated valuation opinion was made evident by the enormous 11.1x multiple that it implied. In contrast, the eight comparable companies identified by Empire showed a multiple range of 5.7x to 10.4x—a range that, even at the high end, was well below the multiple that Empire employed. The median multiple of those comparable companies was 7.6x. At a 7.6x multiple, the value of DSG would be $6.4 billion, which would indicate that the RSNs were significantly insolvent.

115.    Empire acknowledged to Sinclair that it was not "taking professional responsibility for the higher assumed multiple" and instead was "taking [Sinclair's assumption] at face value." However, Empire's 11.1x multiple was also dramatically higher than the 6.5x multiple that Sinclair used internally for its own financial modeling. Sinclair witnesses acknowledged that "[s]ix and a half times, seven times . . . are reasonable levels based on industry norms."

116.    **Fifth**, Sinclair also did not share with Empire its own internal analyses of solvency showing that DSG would not be solvent if Sinclair forced DSG to distribute hundreds of millions of dollars to its corporate parent. As McIntire, the author of the models that showed DSG would be insolvent, put it in an email to Rutishauser, the model "doesn't look good on any of the tests" for solvency. At her deposition, McIntire confirmed that the models she prepared showed that DSG failed the solvency tests. Rather than share this information with Empire, though, Rutishauser explicitly instructed McIntire not to share her models with Empire. Empire's corporate representative confirmed that Empire did not know Sinclair had run its own solvency

analysis in which DSG was found to be insolvent, and that Empire would have wanted to know this information.

117.    At their depositions, both Rutishauser and Ripley tried to downplay the facts that Sinclair's own model showed that DSG was insolvent.  Rutishauser described the model as "just a back of the envelope that we did."  And Ripley called it a "draft" that "really doesn't reflect anything."  But those descriptions belie the facts:  emails show that McIntire spent many hours on the model over a 14-hour work day, and made numerous changes to it at the CFO's direction, before it was ultimately presented to the CEO.  Even with those changes, the model still showed that DSG failed the tests and was insolvent.  Nor was this a one-time use of this model; on the contrary, the model was originally created in April 2020, was further updated over the ensuing months, and in June 2020, while Empire was performing its own analysis, it still showed that DSG was insolvent.

118.    ***Sixth***, Empire's opinion took no account of the market's views, as reflected in the trading prices of DSG's unsecured bonds, which were then below $0.60.

119.    Purportedly in reliance on the Empire opinion, Sinclair's CFO delivered an officer's certificate on August 18, 2020 attesting to DSG's solvency.  Sinclair did not, as it had planned, redeem all of the remaining preferred units, however; instead, it caused DSG to distribute in excess of $350 million to DSIH, to be funneled up the corporate chain and used to redeem a corresponding number of Preferred Equity Units, leaving JPMCFI holding approximately 175,000 Preferred Equity Units.

**E. DSG, Acting Under the Complete Control and Domination of Sinclair, Acted With Fraudulent Intent in Making the Initial DSIH Transfers to DSIH**

120.     As set forth above, the evidence of the fraudulent motives of DSG, acting under the complete control and domination of Sinclair and DSH's Board of Managers, in transferring over $900 million to its parent company within a year of the Acquisition is overwhelming.

121.     The distributions SBG caused DSG to pay to DSIH were subsequently transferred to DSH and used to fund DSH's redemption of the JPMCFI Preferred Equity Units and the quarterly distributions that DSH was obligated to pay under the LLC Agreement (which were guaranteed by SBG).  Neither DSG nor its creditors had any obligations with respect to those Preferred Equity Units, which were obligations of DSH and SBG (as guarantor of DSH's payment obligations on the Preferred Equity Units).  SBG's purpose in causing DSG to make distributions that were intended to fund DSH's and SBG's obligations was to ensure that DSG's cash would be used to fund its indirect equity owners' obligations rather than being preserved for the benefit of DSG's creditors, which would not have provided any benefit to SBG.

122.     Sinclair authorized these massive wealth transfers from DSG to DSIH when it knew or reasonably should have known that DSG was insolvent.  Sinclair's internal projections and private comments demonstrate that Sinclair knew DSG was facing significant financial headwinds, including the loss of up to $400 million in annual revenue from DISH Network's decision to drop the Diamond RSNs, the loss of additional revenue from Hulu and YouTube's expected and eventual abandonment of the Diamond RSNs, increasing subscriber churn caused by cord-cutting, the market value of DSG's debt, which was trading at a severe discount to par, a 50% forecasted decline in revenue between 2018 and 2023, and a decline in projected 2020 EBITDA of more than $850 million over the course of one year.

123.     Smith and Ripley testified that they relied on Rutishauser's reports certifying that DSG was financially solvent and able to issue hundreds of millions in distributions to its parent. Indeed, they both signed written consents on behalf of the Board of Managers of DSH and DSIH-A, and on behalf of the sole members of DSIH and DSG, authorizing those distributions on the basis that they "received and reviewed" Rutishauser's reports certifying the solvency of DSG. But they did not pressure test her reports or know what specifically she did to get comfortable in delivering those reports.

124.     Moreover, when confronted with the evidence of DSG's worsening financials and insolvency at the same time that Sinclair was forcing DSG to distribute nearly a billion dollars for Sinclair's benefit, Rutishauser—Sinclair's CFO, a member of the DSH and DSIH-A Boards of Managers that approved the distributions, the "most senior financial officer" of DSG, and the DSG executive that signed Officer's Certificates certifying that DSG was solvent—feigned ignorance, and could not remember anything of substance related to Diamond's financials or any work done to support her certifications of solvency.  Rutishauser also stressed repeatedly that she is "not a solvency expert" or a "valuation expert," and that the only internal Sinclair liquidity and solvency forecasts that were created were Bray's forecast, in which he recommended that DSG not issue any distributions until February 2020 at the earliest (which recommendation was rejected by Rutishauser and the rest of the DSH and DSIH-A Boards), and McIntire's solvency analysis, which showed DSG was insolvent.

125.     Nor could Rutishauser, or anyone else for that matter, explain how it was in DSG's interest to make distributions to fund payments for which DSG had no obligations, especially considering DSG's precarious financial state.  When pressed on this question, Rutishauser deferred

to "the attorneys," and did not know whether DSG had any obligations under the Preferred Equity Units.

126. Likewise, Smith testified that he did not even understand at the time of the distributions that DSG was the payor, or whether DSG had any legal obligations to pay off the Preferred Equity Units, stating that he viewed Diamond and Sinclair "as one entity," despite acknowledging that there are "tens, hundreds or thousands of subsidiaries structured underneath there for financial reasons or legal reasons or tax reasons" and "different credit stacks." When asked to explain how it was beneficial for DSG to pay hundreds of millions of dollars to help Sinclair reduce its debt obligations, Smith acknowledged that "the structure of those types of things isn't something I spent any time focusing on; therefore, . . . the amount of money that might have been paid from Diamond up to JPMorgan or Diamond . . . to Sinclair into JPMorgan just didn't occur to me. I didn't give it any thought." Willful ignorance, however, does not shield Smith from his fiduciary duties to DSG, or negate the fact that he intended to benefit SBG over DSG.

127. Finally, Sinclair's purported reliance on the wholly unreliable Empire solvency opinion—which Sinclair knew was predicated on unrealistic and unreliable projections that were materially higher than Sinclair's internal forecasts—in causing DSG to distribute hundreds of millions of dollars to DSIH for Sinclair's benefit, further demonstrates Sinclair's bad faith and knowledge of DSG's insolvency.

## VII.   JPMC Aided And Abetted Breaches Of Fiduciary Duty Owed To DSG By Smith, Ripley, Rutishauser and SBG

128. Throughout this period JPMC purported to act as Sinclair's advisor, providing it with materials concluding that the best course of action was to use DSG's funds to redeem the Preferred Equity Units owned by JPMCFI. For example, confidential "Discussion Materials" JPMC provided to Sinclair in December 2019 advised that DSG's "depressed trading levels" "may

create a window for DSG to buyback and retire a portion of the debt at a discount to par through Open Market Purchases." JPMC concluded, however, that "Paying down preferred equity is more [net present value] positive than buying back notes," in part because "Paying down preferred equity will reduce the amount of obligations that are subject to a guarantee from SBG." A separate JPMC presentation from the same period underscored this point further, advising that "[u]pon bankruptcy or insolvency, JPM can look to SBG[] for full payment [on the Preferred Equity Units] . . . and SBG must pay JPM remaining cash in excess of what JPM has received through the bankruptcy proceedings." In July 2020, JPMC reiterated its advice that SBG should cause DSG to transfer funds to DSIH for the ultimate purpose of "paying down preferred equity," rather than capitalizing on the opportunity to decrease its leverage by purchasing its debt at a discount.

129.    At the same time JPMC was providing this advice, it was aware that DSG was insolvent. In internal emails dated December 5, 2019, Joseph Ferraiolo, JPM's Head of Debt Capital Markets Operations & Merchant Bank Policy, panicked that DSH would not be able to pay its obligations on the Preferred Equity Units because DSG had "missed [its] numbers." Richard Gabriel, a JPM Managing Director that worked on the Acquisition, responded that JPM should "focus on [DSG's] public debt," which did not have an SBG guarantee, adding in all capitalized letters "THAT IS WHY WE STRUCTURED [the Preferred Equity Units] THIS WAY AND DIDN'T GIVE IN TO NOT HVING A GUARANTEE FROM SINCLAIR THE PARENT COMPANY. YOUR WELCOME."

130.    Shortly thereafter, on March 4, 2020, a JPM analyst issued a report stating that SBG equity investors were "attributing little or no value to the RSNs," and that based on her assumptions regarding DSG's EBITDA and multiple, DSG had "negative equity value." She added that it was "unclear when the [DSG] silo can dividend cash back to the holding company," which was a

necessary predicate for DSH to make any payments on the Preferred Equity Units. Additionally, on August 4, 2020, a JPM Executive Director observed that one of the reasons that DSG's bonds were trading between 54 and 59 cents on the dollar was because "Bondholders think Sinclair will continue to prioritize paying down the preferred [Preferred Equity Units] rather than look to buyback bonds" at a discount in order to reduce DSG's debt load.

131.    Of course, that was exactly what JPMC, in its role as advisor to SBG, was advising SBG to do. JPMC—no doubt motivated by its own desire to ensure payment on the Preferred Equity Units and to protect its lucrative relationship with Sinclair—never advised SBG that using DSG funds to pay DSH's and SBG's Preferred Equity Unit obligations to JPMCFI provided no value to DSG, or that DSG was insolvent and thus such payments were impermissible.

### VIII.   DSG's Inevitable Bankruptcy

132.    In April 2021, SBG re-shuffled DSG's corporate governance by creating a DSG-level three-member Board of Managers. The new DSG Board of Managers consisted of a Sinclair insider and two independent directors not affiliated with Sinclair. However, SBG continued to exert exclusive control over Diamond's affairs through its ability to remove the DSG managers and full indirect equity ownership of DSG, and SBG's officers and managers continued to serve dual-roles as DSG officers.

133.    Throughout 2021, as Diamond fell deeper and deeper into insolvency, the company engaged in discussions with its creditors for a significant capital infusion. Those discussions ultimately resulted in $635 million of new money financing in March 2022. In connection with that financing, DSG's three-member Board of Managers was replaced with a five-member board consisting of a majority of independent directors appointed and removable only by creditors, as opposed to SBG. But the new financing could not rescue DSG from the damage SBG and JPM

46

had inflicted.  On March 14 and March 15, 2023, DSG and certain of its affiliates filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

### IX.  SBG Purchases JPMCFI's Remaining Preferred Units

134.  The appointment of DSG's new Board of Managers finally put an end to SBG's and JPMCFI's practice of raiding DSG's coffers to fund redemptions of the Preferred Equity Units for DSH's and SBG's benefit.  On February 10, 2023, approximately one month before Diamond filed for bankruptcy protection and following discussions in which JPM highlighted its "great relationship" with SBG, SBG entered into a Preferred Unit Purchase Agreement with JPMCFI whereby SBG agreed to purchase JPMCFI's remaining Preferred Equity Units at 95% of the total amount owed on them (inclusive of accrued interest).  Ultimately, JPM earned a profit in excess of $150 million in connection with its purchase of the Preferred Equity Units.

**CAUSES OF ACTION**

**COUNT I**

**Recovery of Subsequent JPMCFI Transfers Against JPMCFI Under
11 U.S.C. §§ 544, 548(a)(1)(A), 550 and 551 of the Bankruptcy Code**

135.  Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

136.  The Initial DSIH Transfers constitute actual fraudulent transfers that may be avoided pursuant to sections 544 and 548(a)(1)(A) of the Bankruptcy Code.

137.  Under 11 U.S.C. § 548(a)(1)(A), DSG, as a debtor and debtor in possession, may avoid the transfer of an interest of a debtor in property if the debtor made such transfer with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

47

138.    Under 11 U.S.C. § 544(b), DSG, as a debtor and debtor in possession, may avoid the transfer of an interest of a debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-207, *et seq*., the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, the New York Uniform Voidable Transactions Act, N.Y. Debt. & Cred. Law, § 270, *et seq.*, the New York Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law, § 270, *et seq.* (superseded 2020), and other applicable law.

139.    DSIH was DSG's sole member and also the direct recipient of the Initial Transfers.

140.    DSIH and DSG are both wholly owned subsidiaries of SBG.  The officers and managers of DSIH are the same as the officers and managers of DSG, and were composed of all SBG executives.  These officers—namely, Smith, Ripley, and Rutishauser—caused DSG to issue distributions to DSIH and were well aware of DSG's insolvency when DSG made the Initial Transfers.

141.    SBG caused DSG to issue approximately $929 million in distributions to its sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in turn distributed to its parent, DSH, and was ultimately used to fund DSH's and SBG's obligations on the JPMCFI Preferred Equity Units, for which DSG had no responsibility.  DSG funded the Transfers but received no benefit in return.  Instead, SBG exploited its control of DSG to fund SBG's own obligations, at the direct expense of DSG and its creditors.

142.    The distributions were issued with the intent to hinder, delay, or defraud creditors. This intent to hinder, delay, or defraud creditors is evidenced by, among other things, the following badges and direct indications of fraud:

a.) DSG received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Transfers.

48

b.) When the Transfers were made, DSG was (i) insolvent; (ii) engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

c.) SBG—through its full equity ownership of TopCo, DSH, DSIH-A, DSIH, and DSG—maintained control over DSG's affairs and its officers and managers served dual-roles as DSG's officers and managers.

d.) SBG authorized the Transfers when it knew or reasonably should have known that DSG was insolvent.

e.) Neither DSG nor its creditors had any obligations with respect to the JPMCFI Preferred Equity Units, which was a liability only of DSH and SBG (as guarantor).

f.) The Initial Transfers directly benefited SBG at the expense of DSG and its creditors.

143.    As of the Petition Date, there were one or more unsecured creditors of DSG that could avoid the transaction under 11 U.S.C. §§ 548, 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act, the Delaware Uniform Fraudulent Transfer Act, the New York Uniform Voidable Transactions Act, and/or the New York Uniform Fraudulent Conveyance Act.

144.    JPMCFI is a subsequent transferee of the Initial Transfers, and received Subsequent JPMCFI Transfers totaling approximately $922 million.

145.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, DSG is entitled to a judgment against JPMCFI recovering the Subsequent JPMCFI Transfers, or the value thereof, for the benefit of the estate of DSG.

## COUNT II

**Recovery of Subsequent JPMCFI Transfers Against JPMCFI Under
11 U.S.C. §§ 544, 548(a)(1)(B), 550 and 551 of the Bankruptcy Code**

146.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

147.     The Initial Transfers made during and following December 2019 constitute constructive fraudulent transfers that may be avoided pursuant to sections 544 and 548 of the Bankruptcy Code.

148.     Under 11 U.S.C. § 548(a)(1)(B), DSG, as a debtor and debtor in possession, may avoid the transfer of an interest of a debtor in property if the debtor (i) received less than a reasonably equivalent value in exchange for such transfer; and (ii) was insolvent on the date that such transfer was made, or became insolvent as a result of such transfer; was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

149.     Under 11 U.S.C. § 544(b), DSG, as a debtor and debtor in possession, may avoid the transfer of an interest of a debtor in property which is avoidable under applicable law by an unsecured creditor of the debtor, including under the Maryland Uniform Fraudulent Conveyance Act, Md. Code Com. Law, § 15-204, *et seq*., Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301, *et seq.*, the New York Uniform Voidable Transactions Act, N.Y. Debt. & Cred. Law § 270, *et seq.*, the New York Uniform Fraudulent Conveyance Act, N.Y. Debt. & Cred. Law, § 270, *et seq.* (superseded 2020), and other applicable law.

150.     DSIH was DSG's sole member and also the direct recipient of the Initial Transfers.

151.     DSIH and DSG are both wholly owned subsidiaries of SBG.  The officers and managers of DSIH are the same as the officers and managers of DSG, and were composed of all Sinclair executives.  These officers—namely, Smith, Ripley, and Rutishauser—caused DSG to

issue a distribution to DSIH and were well aware of DSG's insolvency when DSG issued the Initial DSIH Distributions.

152.    SBG caused DSG to issue approximately $929 million in distributions to its sole member, DSIH, which was in turn distributed to its sole member, DSIH-A, which was in turn distributed to its parent, DSH, and was ultimately used to redeem the JPMCFI Preferred Equity Units and relieve SBG and DSH of their obligations under those units.  DSG had no obligations to redeem the Preferred Equity Units or to make any payments in connection with them.  DSG funded the Transfers but received no benefit in return.  Instead, SBG exploited its control of DSG to fund SBG's own obligations, at the direct expense of DSG and its creditors.

153.    The Initial Transfers made during and after December 2019 were made at a time when Diamond was insolvent or rendered Diamond insolvent, unable to pay its debts as they came due, or inadequately capitalized.

154.    DSG received less than reasonably equivalent value (and in fact no value) in exchange for the Initial Transfers.

155.    As of the Petition Date, there were one or more unsecured creditors of DSG that could avoid the Transfers under 11 U.S.C. §§ 548(a)(1)(B), 544(b), or other applicable law, including the Maryland Uniform Fraudulent Conveyance Act, the Delaware Uniform Fraudulent Transfer Act, the New York Uniform Voidable Transactions Act, and/or the New York Uniform Fraudulent Conveyance Act.

156.    JPMCFI is a subsequent transferee of the Initial Transfers, and received Subsequent JPMCFI Transfers totaling approximately $922 million.

157.    As a result of the foregoing, pursuant to sections 550(a) and 551 of the Bankruptcy Code, DSG is entitled to a judgment against JPMCFI recovering the Subsequent JPMCFI Transfers made during or after December 2019, or the value thereof, for the benefit of the estate of DSG.

## COUNT III

### Unjust Enrichment Against JPMCFI

158.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

159.    JPMCFI received an unjust windfall at the expense of DSG and its creditors when DSG's cash was funneled up through the corporate chain and used to redeem JPMCFI's Preferred Equity Units and to satisfy DSH's quarterly obligations on the Preferred Equity notwithstanding that DSG had no obligation to make any of these Transfers and was insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at the time that each Transfer was made.

160.    JMPCFI was aware that DSG was insolvent, unable to pay its debts as they came due, or inadequately capitalized at the time that it received these payments, and thus knew that it was being enriched and benefitted at the expense of DSG and its creditors.

161.    JPMCFI has been improperly and unjustly enriched at the expense of DSG and the creditors of its estate.

162.    As a result of the foregoing, equity and good conscience require that JPMCFI return to DSG an amount to be determined at trial, but no less than $922 million, plus prejudgment interest.

## COUNT IV

### Money Had And Received Against JPMCFI

163.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

164.    DSG's cash was funneled up through the corporate chain and used to redeem JPMCFI's Preferred Equity Units and to satisfy DSH's quarterly obligations on the Preferred Equity Units notwithstanding that DSG had no obligation to make any of these Transfers and was insolvent, inadequately capitalized, and/or unable to pay its debts as they came due at the time that each Transfer was made.  By receiving the Subsequent JPM Transfers, JPMCFI received money belonging to DSG.

165.    As a result of the JPMCFI Subsequent Transfers, JPMCFI received a benefit to which it is not entitled, and which rightfully belongs to DSG for the benefit of its creditors.

166.    Principals of equity and good conscious require that JPMCFI return to DSG an amount to be determined at trial, but no less than $922 million, plus prejudgment interest.

## COUNT V

### Aiding and Abetting Breaches of Fiduciary Duty Against JPMC

167.    Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

168.    When a wholly-owned subsidiary LLC is insolvent, the ultimate controller of that subsidiary owes fiduciary duties to it that are breached when the controller makes decisions that favor the controller and/or the LLC's members at the expense of the LLC and its creditors.

169.    From August 2019 through the filing of Diamond's bankruptcy petition, SBG was the ultimate controller of DSG, through its 100% equity ownership interest of TopCo, which has a 100% equity ownership interest in DSH, which has a 99.99653% equity ownership interest in

53

DSIH-A, which has a 100% equity ownership interest in DSIH, which has a 100% equity ownership interest in DSG.

170.    SBG exerted its ultimate control of DSG through its ability to appoint members to the Boards of Managers of the entities supervising DSG's affairs, and its ability to install officers of DSG who managed DSG's every function.

171.    In August 2019, SBG exercised its ultimate control over DSG by causing the appointment of David Smith, Christopher Ripley, and Lucy Rutishauser—all officers of SBG—as members of the DSH and DSIH-A Boards of Managers, which in turn controlled DSIH, the sole member of DSG.  These three SBG executives remained on the Boards of Managers of DSH and DSIH-A through April 2021.  SBG also exercised its ultimate control over DSG by causing the installment of Christopher Ripley as the President of DSG and Lucy Rutishauser as the CFO and Treasurer of DSG, which positions they held until December 2022, and by permitting David Smith to serve as a de facto manager of DSG from August 2019 through December 2022.

172.    Section 18–1101(c) of the Delaware Limited Liability Company Act (the "DLLC") provides that "[t]o the extent that, at law or in equity, a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by the provisions in the limited liability company agreement; provided, that the limited liability company agreement may not eliminate the implied covenant of good faith and fair dealing."  6 Del. C. § 18–1101(c).

173.    As the Delaware Court of Chancery has explained, the DLLC "contemplates that equitable fiduciary duties will apply by default to a manager or managing member of a Delaware

LLC." *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012).  Accordingly, "[m]anagers and managing members" of a Delaware LLC, as well as any person "that . . . controls a manager of the LLC or otherwise has a fiduciary duty to the LLC," owes "default fiduciary duties" to that LLC unless such fiduciary duties are abrogated pursuant to such LLC's limited liability company agreement in accordance with section 18–1101(c) of the DLLC.  *Id.* at 662-63.

174.    The DSG Limited Liability Company Agreement in effect at the time of the Initial Transfers did not abrogate any fiduciary duties owed to DSG.

175.    At all relevant times, DSG was managed by its sole member, DSIH.

176.    At all relevant times, DSIH (and, by extension, DSG) was under the domination and control of DSH and the Board of Managers of DSH.  Accordingly, DSH and its Board of Managers owed fiduciary duties to DSG.

177.    At all relevant times, David Smith, Christopher Ripley, and Lucy Rutishauser also owed fiduciary duties to DSG, as a result of their roles as officers or de facto managers of DSG and members of the DSH Board of Managers, which controlled DSG through DSH's indirect ownership of DSG.

178.    SBG, DSH, Smith, Ripley, and Rutishauser breached their fiduciary duties to DSG by causing DSG to make the Initial Transfers, which were made solely to benefit DSH and SBG at the expense of DSG and its creditors.

179.    JPMC was aware of the fiduciary duties that SBG, DSH, Smith, Ripley and Rutishauser owed to DSG.

180.    JPMC knowingly aided and abetted the breaches of fiduciary duty committed by SBG, DSH, Smith, Ripley, and Rutishauser by, among other things, advising SBG—and by extension DSH, Smith, Ripley, and Rutishauser—to make the Initial Transfers for the purpose of

funding the Subsequent JPMCFI Transfers. JPMC was aware at the time that it provided this advice that DSG was insolvent, unable to pay its debts as they came due, and/or inadequately capitalized, but never advised SBG, DSH, Smith, Ripley or Rutishauser of that fact, or of the fact that making the Initial Transfers would provide no benefit whatsoever to DSG, whereas JPMC's alternative proposal that DSH use its funds to make open market purchases of its debt at discounted prices would allow DSG to reduce its leverage. Instead, JPMC placed its own pecuniary interests above its professional obligations, and knowingly assisted SBG, DSH, Smith, Ripley, and Rutishauser in breaching their fiduciary duties to DSG.

181.    As a result of the foregoing, DSG is entitled to a judgment against JPMC in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, DSG respectfully requests that the Court grant the following relief:

1.    a judgment against JPMCFI finding that the Subsequent JPMCFI Transfers are recoverable by the DSG estate pursuant to sections 550 and 551 of the Bankruptcy Code;

2.    damages in an amount to be determined at trial to compensate DSG for the harm it suffered as a result of JPMCFI being unjustly enriched through the use of DSG's funds to pay SBG's and DSH's obligations to JPMCFI;

3.    damages in an amount to be determined at trial under a theory of money had and received to compensate DSG for the harm it suffered on account of DSG funds being transferred to JPMCFI to satisfy SBG's and DSH's obligations to JPMCFI;

4.    damages in an amount to be determined at trial to compensate DSG for the harm it suffered as a result of JPMC's aiding and abetting the breaches of fiduciary duty committed by SBG, DSH, Smith, Ripley, and Rutishauser;

5.    prejudgment and postjudgment interest;

6.    reasonable attorneys' fees, costs, and expenses incurred in this action; and

7.    any other and further relief as the Court deems just, proper, or equitable under the circumstances.

Dated: July 19, 2023                     PORTER HEDGES LLP


/s/ *John Higgins*

John Higgins
Eric Wade
Heather Hatfield
1000 Main Street, 36th Fl.
Houston, Texas 77002
Tel: (713) 226-6000
Fax: (713) 228-1331


QUINN EMANUEL URQUHART
& SULLIVAN LLP


/s/ *Deborah Newman*

Deborah Newman (admitted *pro hac vice*)
Lindsay Weber (admitted *pro hac vice*)
Kenneth Hershey (admitted *pro hac vice*)
51 Madison Avenue, 22nd Fl.
New York, New York 10010
Tel:  (212) 849-7000
Fax:  (212) 849-7100

*Attorneys for Plaintiff*